UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
JOHN DIORIO,

                                                                    For Online Publication Only

                    Plaintiff,

                                                                    **MEMORANDUM & ORDER**
          -against-                                                  19-CV-1482 (JMA)

ANDREW SAUL,[1]
Commissioner of Social Security,

                    Defendant.
---------------------------------------------------------------X
**APPEARANCES**

**FILED**
**CLERK**

10/7/2020 12:27 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

          Howard D. Olinsky
          Olinsky Law Group
          250 South Clinton St.
          Ste. 210
          Syracuse, NY 13202
          *Attorney for Plaintiff*

          Matthew J. Modafferi
          United States Attorney's Office, EDNY
          271-a Cadman Plaza East
          Brooklyn, NY 11201
          *Attorney for Defendant*

**AZRACK, United States District Judge:**

          Plaintiff John Diorio ("Plaintiff" or "Diorio") seeks review of the final determination by

the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an

administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social

Security Act.  The case is before the Court on the parties' cross-motions for judgment on the

pleadings.  For the reasons discussed herein, Plaintiff's motion for judgment on the pleadings is

---
[1]  Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019.  Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted for Acting Commissioner Nancy A. Berryhill
as the defendant in this suit.

GRANTED, the Commissioner's cross-motion is DENIED, and the case is REMANDED for proceedings consistent with this opinion.

## I.    BACKGROUND

### A.  Procedural History

On December 30, 2014, Plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA"), alleging disability as of March 28, 2014, due to bilateral shoulder pain, left wrist pain, and anxiety.  (Tr. 55-56, 150-51, 169.[2])  Following denial of his claim, Plaintiff requested a hearing and appeared with his attorney for an administrative hearing before Administrative Law Judge Patrick Kilgannon ("ALJ Kilgannon") on June 13, 2017.  (Tr. 35-54.)

In a decision dated July 19, 2017, the ALJ denied Plaintiff's claim, finding that he was not disabled because he still retained the residual functional capacity ("RFC") to perform unskilled light work.  He was limited to sitting/standing/walking six hours each in an eight-hour workday with normal breaks, lifting/carrying 20 pounds occasionally and 10 pounds frequently, and was further limited to occasional bilateral overhead reaching, and frequent handling, fingering, and feeling in his upper extremities. (Tr. 20-24.)   ALJ Kilgannon determined that though these limitations would preclude performance of Plaintiff's previous employment as a bricklayer, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 16-26.)  ALJ Kilgannon's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on July 25, 2018.  (Tr. 8-10.)  This appeal followed.

### B.  Plaintiff's Background and Testimony

Plaintiff was born on July 25, 1963.  (Tr. 164.)  His educational background includes a

---

[2]  Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner.  (ECF No. 16.)

high school diploma.  (Tr. 40, 170.)  Plaintiff testified that he worked as a bricklayer until March 2014, when he was injured on the job.  (Tr. 40-41.)  Plaintiff reported that he was applying windowsill stones to a building when his partner dropped his end of a 250-pound stone and Plaintiff caught the stone so that it would not fall off the building.  (Tr. 414.)

As part of his application for disability insurance benefits, Plaintiff filled out a function report, dated March 2, 2015.  In the function report, Plaintiff stated that his daily activities included having coffee, showering, getting dressed, eating, and watching television.  (Tr. 179.)  Plaintiff noted that he goes outside every day, drives a car, and shops weekly.  (Tr. 181-83.)  He also reported that he babysits his grandchildren, aged 3-years-old and 4 months-old, and has no problems with personal care. (Tr. 179.)  He reported playing card games and board games weekly. (Tr. 183.)  However, Plaintiff stated he could not work, bend, or lift anything over five pounds. (Tr. 181.)  Plaintiff is not able to clean, do household chores or laundry, and has pain while lying in bed.  (Tr. 179, 181.)  He reported that he could walk up to 300 feet before needing to rest for three to five minutes, and also has difficulty with kneeling, squatting, reaching, using his hands, and hearing.  (Tr. 184-85.)

At the June 13, 2017 hearing, Plaintiff testified that he has pain in his left wrist ranging from 6 out of 10 to 10 out of 10 and wears a brace approximately three times a week, and sometimes longer.  (Tr. 42-43.)  Plaintiff testified that he wakes up with pain in his wrist that is worsened by activity including squeezing, picking up objects, folding laundry, and pressure.  (Tr. 43-44.)  Plaintiff also testified he has pain in both shoulders, and that the pain in his right shoulder is "now" worse than the pain in his left shoulder.  (Id.)  Plaintiff testified that he has pain in his right shoulder ranging from 7 out of 10 to 10 out of 10.  (Tr. 43.)  He had surgery on his left shoulder, but still suffers pain ranging from a 4 out of 10 to 8 out of 10.  (Id.)  He wakes with pain

3

in both shoulders that worsens with activity, including lifting and household chores.  (Tr. 43-44.)
Plaintiff also testified that he has pain in his neck, which is worsened by everyday activities such
as walking, driving, sitting, or standing, and ranges from 5 out of 10 to 10 out of 10.  (Tr. 43-45.)
He experiences shortness of breath about twice per day from walking and bending.  (Tr. 45.)
Plaintiff testified he could sit for approximately 20 minutes before he would need to stand up,
stretch, or walk around for three to five minutes.  (Tr. 47-48.)  He can stand for 45 minutes, but he
will start to feel pain after approximately 15 minutes.  (Tr. 48.)  Plaintiff testified that he could lift
"five, ten pounds, maybe," but stated that he had difficulty grabbing objects with both his hands,
as well as reaching in all directions.  (Tr. 48-50.)  Plaintiff testified that he is able to shower, get
dressed, tie his shoes, but does so with pain.  (Tr. 51.)  He is unable to do housework without the
assistance of his wife or grown son.  (Tr. 50-51.)  He has difficulty sleeping as a result of his pain
and anxiety.  (Tr. 50.)  He testified that he takes anti-inflammatory medication for his shoulders
and a muscle relaxer, gets Cortisone shots in his right shoulder, and does at-home physical therapy.
(Tr. 41-42, 46.)  He stated that he was waiting to have surgery on his right shoulder, following
planned colon surgery.  (Tr. 41.)

## C. **Relevant Medical Evidence**

### 1. **Dr. Richard Tabershaw – Orthopedist**

Richard J. Tabershaw, M.D., treated Plaintiff between April 7, 2014 and April 20, 2017
primarily for bilateral shoulder pain and left wrist pain.  On April 7, 2014, Plaintiff first underwent
an orthopedic consultation with Dr. Tabershaw, at Suffolk Orthopaedic Associates, for left
shoulder pain, following an emergency room visit the day prior and upon referral from his primary
care physician, Vikas Desai, M.D.  (Tr. 310.)  Dr. Tabershaw diagnosed acute rotator cuff and
biceps tendinopathy and stated he could not rule out a SLAP lesion.  (Tr. 311.)  On April 14, 2014,

4

Plaintiff had an MRI of his left shoulder, which revealed mild supraspinatus and anterior infraspinatus tendinopathy, minimal subacromial/subdeltoid and mild subcoracoid bursitis, mild localized synovitis in the anterosuperior glenohumeral joint, a SLAP tear with small posterosuperior paralabral cyst, small chronic tears of the posterior and anterior labrum, and mild hypertrophic acromioclavicular joint degeneration.  There was no evidence of a rotator cuff tear. (Tr. 314.)  On April 18, 2014, Plaintiff had a follow-up with Dr. Tabershaw where he reported only mild improvement from his last visit, and that most of his symptoms resulted from reaching in front.  (Tr. 318.)  Dr. Tabershaw noted tenderness over the biceps tendon, that Plaintiff's Speed and throw-through signs were positive, discomfort with abduction external rotation but no gross instability, and that his cuff strength was well-maintained.  (Id.)  Dr. Tabershaw treated Plaintiff's shoulder with a lidocaine injection, and Plaintiff reported improved symptoms immediately after. (Id.)  Dr. Tabershaw advised Plaintiff that if there was no significant improvement following the injection and physical therapy, an arthroscopic labral repair surgery would be indicated.  (Id.)  Dr. Tabershaw also recommended Plaintiff wait ten to fourteen days to return to work.  (Id.)

On May 5, 2014, Plaintiff had a follow-up visit with Dr. Tabershaw and reported that the injection provided some relief.  (Tr. 319.)  Dr. Tabershaw found that physical therapy for six to twelve weeks was indicated, and that Plaintiff should not perform heavy labor but could perform very sedentary activities.  (Id.)  On June 16, 2014, Plaintiff had another follow-up visit with Dr. Tabershaw and reported that six weeks of physical therapy provided him some relief.  (Tr. 320.) Plaintiff also reported that he pulled his right shoulder while moving luggage because he was not using his left shoulder.  (Id.)  On examination, Plaintiff had positive abduction external rotation pain on both sides, with greater pain on the left, and had a positive SLAP stress test on the right. (Id.)  Dr. Tabershaw recommended six more weeks of physical therapy, after which he

recommended Plaintiff try to return to work, "hopefully in a foreman-type position where he is only doing intermittent heavy lifting." (Id.)  If that failed, he would be treated with arthroscopic surgery. (Id.) Dr. Tabershaw also recommended that the right shoulder be treated on an as-needed basis. (Id.)

On July 1, 2014, Plaintiff returned to Dr. Tabershaw complaining of left wrist pain and right shoulder pain. (Tr. 327.)  On examination of Plaintiff's right shoulder, Dr. Tabershaw found no swelling, but tenderness to palpation was noted, with active range of motion limited in all planes due to pain. (Tr. 328.)  Dr. Tabershaw diagnosed a mild wrist sprain and noted that his right shoulder pain was likely compensatory due to Plaintiff's left shoulder injury. (Id.) Dr. Tabershaw noted that Plaintiff could perform no work at that time and advised him to avoid any strenuous activity. (Id.)

On July 18, 2014, an MRI of Plaintiff's right shoulder revealed a low to moderate grade focal partial articular surface tear consistent with a moderate grade SLAP lesion, mild acromioclavicular hypertrophy with mild subacromial/subdeltoid bursitis, and mild infraspinatus tendinosis. (Tr. 323.)

On July 28, 2014, Plaintiff had a follow-up visit with Dr. Tabershaw. (Tr. 329-330.) Dr. Tabershaw diagnosed a left wrist sprain, and bilateral shoulder pain due to rotator cuff tendinopathy and labral tears. (Tr. 330.) Dr. Tabershaw authorized bilateral shoulder arthroscopic surgery with the left shoulder surgery to be performed prior to the right.  He advised that Plaintiff use a wrist splint and avoid heavy lifting, and noted Plaintiff would continue to be out of work. (Id.)

On September 8, 2014, Plaintiff visited Dr. Tabershaw and reported that he was "miserable" due to pain. (Tr. 331.)  Dr. Tabershaw again stated that he planned to proceed with

6

left shoulder arthroscopic surgery, and if successful, it would be performed on the right shoulder as well.  (Tr. 331-332.)  Dr. Tabershaw assessed 100% disability.  (Tr. 332.)

On January 23, 2015, Plaintiff underwent surgery on his left shoulder.  (Tr. 337.)  Dr. Tabershaw noted that Plaintiff should get some relief following surgery and hoped that would allow Plaintiff to return to his activities.  (Id.)   On January 29, 2015, Plaintiff had a follow-up visit with Dr. Tabershaw.  (Tr. 365.)  Plaintiff complained that he was uncomfortable.  On examination, Dr. Tabershaw found that he had minimal active range of motion and prescribed physical therapy. (Id.)

On February 19, 2015, Plaintiff reported that he was markedly better and was attending physical therapy three times per week.  (Tr. 367.)  Dr. Tabershaw noted that Plaintiff was doing very well at less than one-month post-op, and that Plaintiff's temporary impairment continued to be 100%.  (Id.)

On March 16, 2015, Plaintiff reported to Dr. Tabershaw that his left shoulder was hurting a lot particularly over the AC joint and that he felt he had backslid.  (Tr. 369.)  On examination, Dr. Tabershaw noted fluid over the shoulder and exquisite pain over the AC joint and subacromial, which was precipitated by abduction external rotation.  (Tr. 369.)  A subacromial injection was administered, and Plaintiff was capable of full forward elevation of the shoulder, but he was still tender over the AC joint, and abduction external rotation still caused pain.  (Id.)

On March 28, 2015, Dr. Tabershaw completed an upper extremity impairment questionnaire.  (Tr. 357.)  Dr. Tabershaw noted that Plaintiff was limited to no more than occasional lifting and carrying up to five pounds.  (Tr. 359.)  His pain increased with significant repetitive reaching, handling, or fingering.  (Tr. 360.)  Dr. Tabershaw reported that Plaintiff had minimal limitations in grasping, turning, or twisting objects, and using his fingers or hands for fine

7

manipulative skills; moderate limitations in using his arms for reaching; and that he was limited to no pushing or pulling. (Tr. 359-61.) Dr. Tabershaw further noted that Plaintiff would be absent more than three times a month as a result of his impairments or treatment. (Tr. 361.)

On April 27, 2015, Plaintiff reported that his shoulder still hurt and that he still had significant pain when he abducted and externally rotated. (Tr. 371.) On examination, Dr. Tabershaw noted that there was no pain over the AC joint, but mild pain over the bicipital groove and during abduction external rotation. (Id.) Dr. Tabershaw reported that Plaintiff was 100% disabled at the time, but he anticipated Plaintiff would be able to return to sedentary duty. (Id.)

On June 1, 2015, Plaintiff reported to Dr. Tabershaw that the injection at the last visit did not give him any significant improvement. (Tr. 383.) On examination, Dr. Tabershaw observed tenderness when Plaintiff abducted or rotated the shoulder, persistent left shoulder pain, and his squeeze test was positive. (Id.) Dr. Tabershaw assessed that Plaintiff was totally disabled from his work as a bricklayer. (Tr. 381.)

On May 18, 2016, Plaintiff saw Dr. Tabershaw again and reported that his left shoulder was doing well post-surgery and it was tolerable. (Tr. 410.) Plaintiff complained of intermittent pain and swelling of his left wrist. (Id.) Dr. Tabershaw diagnosed left wrist tenosynovitis with sprain, and mild post-traumatic arthritis. (Id.) On May 27, 2016, Plaintiff reported that he was doing significantly better and on examination, there was minimal tenderness, range of motion of his wrist had improved without any significant discomfort, and he exhibited full grip strength. (Tr. 413.) On June 21, 2016, Plaintiff reported that his neck hurt, that he got pain down his right arm when he turned to the right and could not turn all the way to the right, and that his left shoulder had been hurting him. Dr. Tabershaw noted that he felt the right shoulder problems were consequential to the injury. (Tr. 407.)

On September 15, 2016, Plaintiff reported to Dr. Tabershaw that his left wrist was still bothering him, his left shoulder was better but he still had pain, and his right shoulder hurt.  He also had significant paresthesia that went down his hands.  (Tr. 421.)  Plaintiff also reported at this visit that he had not seen the doctor in a few months because he was having major problems with his insurance.  (Id.)  Dr. Tabershaw found that, while the left shoulder surgery provided Plaintiff with some relief, it was a mistake not to take the bicep tendon during the surgery, as Plaintiff's symptoms were predominately bicipital.  (Id.)  He found that with respect to the right shoulder, Plaintiff would probably benefit surgery.  In the future he might need a biceps release on the left side.  (Id.)  Dr. Tabershaw further stated that Plaintiff was disabled and his job as a bricklayer was behind him.  He noted that some improvement was possible with injections and an epidural to his neck and right shoulder surgery.  (Id.)

On November 1, 2016, Plaintiff reported that his right shoulder was becoming progressively more painful, his left shoulder still had significant pain, and his left wrist was still bothering him significantly.  (Tr. 424.)  Dr. Tabershaw reported that Plaintiff exhibited pain in both his shoulders and left wrist.  (Id.)  Dr. Tabershaw diagnosed left wrist post-traumatic arthritis and sprain, cervical sprain with herniated discs, bilateral shoulder sprains with post-traumatic bicipital tendinitis, and rotator cuff tendonitis and impingement syndrome.  (Id.)  Plaintiff was treated with a left wrist injection.  (Id.)  On December 1, 2016, Plaintiff reported that he felt that his left shoulder was still the same but the pain had diminished by 50%, his left wrist was feeling much better after the injection, and he continued to experience pain in his right shoulder.  (Tr. 427.)  Dr. Tabershaw diagnosed a right shoulder impingement, AC joint arthritis, tendinitis, degenerative labral tearing with bicipital labral disease, and work-related injury to the left wrist.  (Id.)  Dr. Tabershaw opined that Plaintiff was disabled from his regular job, and he would never

let him return to any type of heavy masonry work.  (Id.)  He further opined that Plaintiff's disability was 50% related to the shoulder.  (Id.)

In March and April 2017, Plaintiff indicated that he was experiencing significant pain in his right shoulder and that he wanted to consider surgery.  (Tr. 429.)  He reported that his left wrist and shoulder were somewhat feeling better.  (Id.)  Dr. Tabershaw reported that Plaintiff wanted to proceed with right shoulder surgery but had to first wait for his diverticulitis treatment before proceeding.  (Id.)  Plaintiff's disability was listed at 50%.  (Tr 436.)

### 2. Dr. Vikas Desai – Internist

On February 16, 2015, Vikas Desai, M.D., completed an impairment questionnaire in connection with Plaintiff's state disability claim.  Dr. Desai reported that Plaintiff had a SLAP tear resulting in severe shoulder pain with decreased range of motion.  (Tr. 353-54.)  Dr. Desai reported that Plaintiff was limited in pushing and pulling, and limited to frequently lifting no more than five pounds.  (Tr. 355.)  He opined that Plaintiff had no limitations in standing, walking, or sitting. (Id.)

### 3. Dr. Andrea Pollack – Consultative Examination

At the request of the Commissioner, Plaintiff underwent a consultative physical examination by Andrea Pollack, D.O., on February 9, 2015, a few weeks after his shoulder surgery. (Tr. 346.)  Plaintiff reported that he had been experiencing shoulder, wrist, and elbow pain since a work-related injury on March 21, 2013[3], and had been diagnosed with a SLAP tear of the left shoulder.  (Id.)  Plaintiff indicated that he can shop, shower, and get dressed.  As part of the physical examination, Dr. Pollack noted that Plaintiff's gait was normal; he was in no acute distress; he could walk on his heels and toes without difficulty; he could squat 2/3 of the way

---

[3] This appears to be an error in the record.  This should state March 2014.

down; and his stance was normal.  (Tr. 347.)   Plaintiff needed no help changing for the exam, or getting on and off the exam table, and was able to rise from a chair without difficulty.  (Id.)  He also demonstrated full range of motion of his elbows, forearms, wrists, and ankles.  (Tr. 348.) Plaintiff's left shoulder forward elevation and abduction was 100 degrees, adduction was 15 degrees, internal rotation was 20 degrees, and external rotation was 45 degrees.  (Id.)  His joints were stable and non-tender.  He demonstrated 5/5 strength in upper and lower extremities.  (Id.)

Dr. Pollack diagnosed Plaintiff with bilateral shoulder pain, bilateral knee pain, and left wrist and elbow pain.  (Tr. 349.)  Dr. Pollack noted that Plaintiff had moderate restrictions in lifting, carrying, pushing, pulling, and reaching with his left arm; mild to moderate restrictions in squatting; moderate restriction in bending; and mild restriction in walking, standing, climbing stairs, and kneeling.  (Id.)

### 4.  Other Records

The administrative record includes medical records from other doctors and facilities dating back to 2004.  (Tr. 233-309.)  Much of Plaintiff's history predating his alleged onset date deal with his abdominal issues, diverticulosis, and kidney stones.  (Id.)  Plaintiff does not claim a disability based on these ailments.   There are also medical records regarding his mental health and anxiety. (Tr. 340-43, 431-34.)  Plaintiff does not seek review of ALJ Kilgannon's findings regarding his mental health.  (See Pl. Br., generally.)

## D.  The ALJ's Decision

ALJ Kilgannon issued his decision on July 19, 2017, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520.  (Tr. 13–26.)  At step one, ALJ Kilgannon concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of March 28, 2014.  (Tr. 18.)   At step two, ALJ Kilgannon found that Plaintiff has severe

11

impairments of cervical degenerative disc disease, bilateral shoulder degenerative joint disease status-post left shoulder arthroscopic repair, and left wrist degenerative joint disease. (Id.) At step three, ALJ Kilgannon determined that Plaintiff's impairments, alone or in combination do not meet or medically equal the severity of any of the regulation's listed impairments. (Tr. 20.) Specifically, ALJ Kilgannon considered Listings 1.00, 1.02, and 1.04. (Id.)

ALJ Kilgannon then addressed step four, first considering Plaintiff's RFC. An RFC determination identifies what work a claimant can still perform, despite his limitations. See C.F.R. § 404.1545. The ALJ found that Plaintiff had the RFC to perform unskilled light work limited to sitting/standing/walking six hours each in an eight-hour workday with normal breaks, lifting/carrying 20 pounds occasionally and 10 pounds frequently, and was further limited to occasional bilateral overhead reaching, and frequent handling, fingering, and feeling in his upper extremities. (Tr. 20-24.)

In considering Plaintiff's limitations, ALJ Kilgannon made various observations about Plaintiff's testimony and reviewed Plaintiff's medical records. (Tr. 20-24.) ALJ Kilgannon afforded "little weight" to Dr. Tabershaw's opinion that Plaintiff was totally/partially disabled or had a 50% or 60% disability because any physician statements in the record that offer that a claimant is "disabled" are considered only for the fact that they are stated, and are entitled to no special significance because the legal finding of disability is reserved for the Commissioner of Social Security. (Tr. 22.) ALJ Kilgannon afforded "limited weight" to the upper extremity questionnaire that Dr. Tabershaw completed in March 2015 because: "the opinion offered, only a few months after surgery, is inconsistent with later treatment records, suggesting some relief from treatment, which includes surgery and that the claimant is right hand dominant;" "there is little objective support for the extreme limitations in lifting/carrying, which are inconsistent with the

treatment records;" and the opinion was "also inconsistent with the notation that [Dr. Tabershaw] felt the claimant could return to sedentary duty." (Tr. 22-23.)

ALJ Kilgannon afforded "little weight" to the opinion furnished by Dr. Vikas Desai, because the opinion offered was outside the specialty of Dr. Desai, an internist, and inconsistent with the orthopedic record which suggested some positive response to treatment. (Tr. 23.)

ALJ Kilgannon afforded "good weight" to the opinion of the consultative examiner, Dr. Pollack, because it was consistent with Dr. Pollack's examination. (Id.)

Upon consideration of the evidence, ALJ Kilgannon found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence. (Tr. 24.) Based on the RFC, ALJ Kilgannon concluded at step four that Plaintiff could not perform his past relevant work as bricklayer. (Id.)

Finally, ALJ Kilgannon relied on the testimony of the Vocational Expert ("VE") to determine at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform including a furniture rental consultant, usher, and counter clerk. (Tr. 25-26, 52-53.) Accordingly, ALJ Kilgannon found that Plaintiff was not under a disability as defined in the Social Security Act from March 28, 2014 through the date of his decision. (Tr. 26.)

## II. DISCUSSION

### A.  Social Security Disability Standard

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is

disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).   As part of the fourth step, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work.  20 C.F.R. § 404.1520(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)).

### B.  Scope of Review

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means

14

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)).  "'To determine whether the findings are supported by substantial evidence, the reviewing

court is required to examine the entire record, including contradictory evidence and evidence from

which conflicting inferences can be drawn.'"   Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999)

(quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court

will not look at the record in "isolation but rather will view it in light of other evidence that detracts

from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122,

126 (2d Cir. 1990).  An ALJ's decision is sufficient if it is supported by "adequate findings . . .

having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

## C. Analysis

Plaintiff puts forth two arguments in support of his appeal of ALJ Kilgannon's decision.

First, Plaintiff argues that ALJ Kilgannon failed to properly weigh the opinion of his treating

physician, Dr. Tabershaw, and the opinion of consultative examiner, Dr. Pollack, and therefore,

the RFC is not supported by substantial evidence.  (Pl.'s Br. at 9-22.)  Second, Plaintiff contends

that his case was adjudicated by an improper and unconstitutionally appointed ALJ and should

therefore be remanded.  (Id. at 22-25.)  The Court agrees that ALJ Kilgannon failed to provide

"good reasons" for not affording Dr. Tabershaw's opinion controlling weight under the treating

physician rule.  Remand is therefore warranted.

### 1.  RFC Analysis

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's]

limitations."  Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see

Crocco v. Berryhill, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating

that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (citing 20 C.F.R. § 404.1545(b)).

In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)).  An RFC determination must be affirmed on appeal where it is supported by substantial evidence in the record.  Barry, 606 F. App'x at 622 n.1.

### 2. Dr. Tabershaw's Opinion

The administrative record contains medical records documenting Dr. Tabershaw's treatment of Plaintiff's shoulders and left wrist from April 7, 2014 through April 20, 2017.  On March 28, 2015, Dr. Tabershaw completed an upper extremity impairment questionnaire.  (Tr. 357.)  In the questionnaire, Dr. Tabershaw noted that Plaintiff was limited to no more than occasional lifting and carrying of up to five pounds, that his pain increased with significant repetitive reaching, handling, or fingering, that he had minimal limitations in grasping, turning, or twisting objects and using his fingers or hands for fine manipulative skills, and moderate limitations in using his arms for reaching.  (Tr. 359-61.)  Dr. Tabershaw further noted that Plaintiff would be absent more than three times a month as a result of his impairments or treatment, and that he was limited to no pushing or pulling.  (Tr. 361.)

ALJ Kilgannon afforded "limited weight" to the upper extremity questionnaire for four reasons: (1) "the opinion offered, only a few months after surgery, is inconsistent with later

treatment records, suggesting some relief from treatment, which includes surgery;" (2) the opinion was inconsistent with treatment records stating that Plaintiff is right hand dominant; (3) "there is little objective support for the extreme limitations in lifting/carrying, which are inconsistent with the treatment records;" and (4) the opinion was "inconsistent with the notation that [Dr. Tabershaw] felt the claimant could return to sedentary duty." (Tr. 22-23.)

### 3. The ALJ Failed to Properly Apply the Treating Physician Rule in Weighing Dr. Tabershaw's Opinion

In weighing Dr. Tabershaw's opinion, the ALJ was bound by the "treating physician rule" that was in effect when Plaintiff filed his application. If a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). A treating physician's opinion "on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). An ALJ must provide "good reasons" not to grant controlling weight to a treating physician's opinion. See Schaal, 134 F.3d at 503-04. And, when a treating physician's opinion is not given controlling weight, the ALJ should "comprehensively set forth reasons for the weight assigned" to that opinion, considering the factors identified in the SSA regulations. Halloran, 362 F.3d at 33; see also 20 C.F.R. § 404.1527(c). These same factors are to be considered when evaluating other medical opinion evidence.

A number of the reasons the ALJ provided to discount Dr. Tabershaw's opinion are flawed and, at the very least, require further explanation from the ALJ.

ALJ Kilgannon's first reason for affording limited weight to Dr. Tabershaw's opinion is

"that it was offered only a few months after surgery" and is inconsistent with Dr. Tabershaw's later treatment records. (Tr. 22.)  However, all three medical opinions in the record regarding Plaintiff's shoulders and wrist were performed in the nine weeks following Plaintiff's January 23, 2015 surgery, with Dr. Tabershaw's being the latest examination.  Dr. Pollack examined Plaintiff on February 9, 2015, and the ALJ afforded her opinion good weight.  (Tr. 23.)  Dr. Desai examined Plaintiff on February 16, 2015, and the ALJ afforded his opinion little weight.  (Id.)  Dr. Tabershaw completed the upper extremity questionnaire on March 28, 2015, which the ALJ afforded limited weight.  (Id.)  The ALJ fails to explain why he accorded Dr. Tabershaw's opinion "limited weight" because it was performed "only" two months after surgery but gave "good weight" to Dr. Pollack's opinion, which was performed only one month after surgery.  In assessing Dr. Pollack's opinion, the ALJ failed to address whether the timing of Dr. Pollack's examination affected his analysis, as it did with Dr. Tabershaw's opinion.

Second, with regard to Dr. Tabershaw's later treatment records, the ALJ failed to address whether he considered the records concerning Plaintiff's right shoulder.  (Id.)  The ALJ is correct that some of Dr. Tabershaw's later treatment records from May 2016 through December 2016 following the surgery suggest some relief in Plaintiff's left shoulder.  (See, e.g., Tr. 410 (May 18, 2016 record showing that Plaintiff reported that his left shoulder was doing well post-surgery and it was tolerable); Tr. 421 (September 15, 2016 record showing Plaintiff reported that his left shoulder was better but he still had pain); Tr. 427 (December 1, 2016 record showing that Plaintiff reported that he felt that his left shoulder was still the same but the pain had diminished by 50%)).  However, the treatment records also suggest a worsening of Plaintiff's right shoulder.  (See, e.g., Tr. 407 (June 21, 2016 record showing that Plaintiff reported that he had pain down his right arm when he turned to the right and could not turn all the way to the right); Tr. 424 (November 1, 2016

record showing that Plaintiff reported that his right shoulder was becoming progressively more painful); Tr. 427 (December 1, 2016 record showing that Plaintiff continued to experience pain in his right shoulder); Tr. 429 (March 2, 2017 record showing that Plaintiff expressed significant pain in his right shoulder and that he wanted to consider surgery)).  Additionally, on September 15, 2016, Dr. Tabershaw opined that, while the left shoulder surgery provided Plaintiff with some relief, it was a mistake not to have taken the bicep tendon during the surgery, as Plaintiff's symptom where predominately bicipital, and that in the future he might need a biceps release on the left side.  He also found that with respect to the right shoulder, Plaintiff would probably benefit from surgery.  (Tr. 421.)  At the time of the hearing, Plaintiff stated he was waiting to have surgery on his right shoulder until after a surgery for his colon.  (Tr. 42.)   The ALJ also did not explicitly address that while part of the upper extremity questionnaire is focused on Plaintiff's left shoulder injury, (Tr. 357 (identifying the left shoulder as the location of the injury)), other parts of the questionnaire are based on limitations in Plaintiff's left and right upper extremities (Tr. 361 (Plaintiff had moderate limitations in the left and right arms for reaching).)  It is not clear from the questionnaire whether Dr. Tabershaw is referring to both the left and right shoulder, or just the left in the lifting/carrying portion.  (Tr. 359.)  The ALJ failed to explain whether he took into account the later treatment records regarding the right shoulder and the portions of the questionnaire concerning the right shoulder, and if not, his reasons for not doing so.

The ALJ's third reason for affording limited weight is that the opinion is inconsistent with treatment records that state that Plaintiff is right hand dominant.  (Tr. 22.)  However, the ALJ did not explain how this fact affected his analysis of Dr. Tabershaw's opinion.  Plaintiff's disability claim alleges injuries to both shoulders, not only the left, and, as noted, above the upper extremity questionnaire is based on both the left and right shoulders.

19

Fourth, the ALJ reasoned that Dr. Tabershaw's March 28, 2015 opinion was "inconsistent with the [April 27, 2015] notation that [Dr. Tabershaw] felt the claimant could return to sedentary duty." (Tr. 22.)  However, the notation that the ALJ references states: "Disability: 100% at this time. I anticipate being able to return him to sedentary duty, which his job is not." (Tr. 371.)  Dr. Tabershaw did not say that Plaintiff <u>could</u> return to sedentary duty at the time he wrote the note, but rather that he <u>anticipated</u> returning Plaintiff to sedentary duty at some unspecified point in the future.  Additionally, as explained further below, even if Plaintiff's left shoulder issues did sufficiently resolve at some point, the ALJ failed to consider, whether a closed period of disability existed here.

Given the above, the ALJ failed to provide "good reasons" to afford Dr. Tabershaw's opinion only "limited weight."  Since ALJ Kilgannon failed to properly assess the opinions of Plaintiff's treating physician, Dr. Tabershaw, the Court offers no opinion as to the weight he assigned to the consultative examiner, Dr. Pollack, or Plaintiff's internist, Dr. Desai, because such weight may change on remand.  Accordingly, upon remand, the Commissioner must assess, and adequately explain, the proper weight for each of the medical opinions in the record according to the treating physician rule and determine if such an assessment requires reconsideration of Plaintiff's RFC.  The Commissioner should also consider whether it is necessary to conduct a more recent medical examination regarding Plaintiff's physical limitations, since all three medical opinions were given in the nine weeks immediately following Plaintiff's surgery and Plaintiff testified at the hearing that he might have surgery on his right shoulder in the near future.

### 4.   The ALJ Failed to Consider Whether There Was a Closed Period of Disability

"A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting

disability status." Carbone v. Astrue, No. 08-CV-2376, 2010 WL 3398960, at *13 n.12 (E.D.N.Y. Aug. 26, 2010) (internal citation and quotation marks omitted).  In determining that a claimant improved from his previously disabled state, an ALJ must base his opinion on substantial evidence using the medical improvement rule. Nascimento v. Colvin, 90 F. Supp. 3d 47, 53 (E.D.N.Y. 2015) ("[W]hen the Commissioner determines that a claimant is disabled only for a closed period, such a finding must be demonstrated by substantial evidence of medical improvement in the claimant's impairment or combination of impairments such that the claimant is now able to engage in substantial gainful activity.").

The ALJ placed significance on Dr. Tabershaw's treatment notes following the March 28, 2015 upper extremity questionnaire, showing some relief in Plaintiff's left shoulder over time. However, the ALJ did not state whether he considered if Plaintiff was entitled to a closed period of benefits for the time prior to his left should improving.  Plaintiff's alleged onset date was March 28, 2014, and Dr. Tabershaw completed the upper extremity questionnaire on March 28, 2015, suggesting that Plaintiff's left shoulder disability lasted for at least 12 months.  According to the treatment records, Plaintiff continued to have problems with his left shoulder until at least June 2015.  (Tr. 381.)  "[E]ven if substantial evidence supports a finding that [Plaintiff's] symptoms improved before the ALJ issued [his] decision, at which time [he] was no longer disabled," the ALJ should have at least considered whether Plaintiff was entitled to a closed period of benefits for some period of time following the alleged onset date.  Smith v. Berryhill, No. 17-CV-5639, 2018 WL 5619977, at *12 (S.D.N.Y. Aug. 10, 2018), report and recommendation adopted, 2018 WL 4565144 (S.D.N.Y. Sept. 24, 2018) (finding that "it was legal error—on this record—for the ALJ not to consider a closed period of disability following the alleged disability onset date," where the evidence suggested Plaintiff's symptoms from a work place injury lasted longer than 12

months, and directing the Commissioner to consider a closed period of disability on remand even if he still found that Plaintiff recovered to the point she was no longer disabled prior to his decision).   Upon remand, even if the Commissioner still concludes that Plaintiff's condition improved by the time of his decision, the Commissioner should consider whether there was a closed period of disability.

### 5.   Challenge to ALJ Kilgannon's Appointment

Plaintiff also argues that his case should be remanded because it was decided by an ALJ who was not constitutionally appointed at the time of the decision. Citing Lucia v. Securities Exchange Commission, in which the Supreme Court held that ALJ officers employed by the Securities and Exchange Commission must be properly appointed, 138 S. Ct. 2044, 2053 (2018), Plaintiff argues that the appointment of the ALJ was unconstitutional.  (Pl's Br. at at 22-25.)  Plaintiff acknowledges that he did not raise this issue before the ALJ or Appeals Council, and is raising it for the first time in this appeal.  (Id.)

Because this case is being remanding for further proceedings on other grounds, it is unnecessary for the Court to address Plaintiff's Lucia argument.

### III.  CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for judgment on the pleadings; DENIES the Commissioner's cross-motion; and REMANDS the case for further proceedings consistent with this opinion.  The Clerk of Court is respectfully directed to enter judgment accordingly.

**SO ORDERED.**

Dated: October 7, 2020
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE
